**In re GRAND JURY PROCEEDINGS, Robert Michael AYRES.**

**Misc. No. 86–159 P.**

United States District Court, D. Rhode Island.

Jan. 5, 1987.

Kenneth P. Madden, Asst. U.S. Atty., Providence, R.I., for U.S. Government.

Judith Mizner, Boston, Mass., for Ayres.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

On November 14, 1982, Robert Michael Ayres ("Ayres") refused to answer questions put to him by a federal grand jury. Ayres invoked the privilege against self-incrimination, despite having been granted use and derivative use immunity by this Court. The United States of America ("the government") subsequently petitioned this Court for an Order to show cause why Ayres should not be held in civil contempt. For reasons discussed herein, I find that Ayres lacks just cause to refuse to answer the disputed questions before the grand jury, but I decline to impose civil contempt sanctions pending his reappearance before the grand jury.

### Background

On August 9, 1982 a task force of federal and state officers seized a sailing vessel carrying a quantity of marijuana off the Rhode Island coast. On shore, officers seized a truck towing an empty motorboat that appeared to have been used in an attempted rendezvous with the sailing vessel. Ayres, a passenger in the truck, was immediately arrested, ordered to lie face down in the dirt, handcuffed behind his back, and with a rifle pointed at him, was read his *Miranda* rights. He made certain inculpatory statements ("arrest statements") at this time.

Ayres was then turned over to the custody of the local police department. According to testimony by certain local police officers, Ayres was read his *Miranda* rights en route to the stationhouse and was read them again upon being placed in a holding cell. After this latter warning, Ayres made further inculpatory statements ("stationhouse statements"), to the effect that he had been involved with a regional drug smuggling operation and that he had attempted earlier in the evening a rendezvous with the seized sailing vessel.

In November, 1982 Ayres and others were tried on charges of importation, possession and possession with intent to distribute controlled substances, and on charges of conspiracy to accomplish certain of these alleged crimes. Ayres moved to suppress both his arrest statements and his stationhouse statements. I ruled then that the circumstances surrounding Ayres' arrest statements rendered them involuntary, and I therefore suppressed them. I found that his stationhouse statements were voluntary, however, and therefore admitted them subject to the jury's making an independent finding as to voluntariness.

The jury neither was asked for nor returned a specific verdict as to the voluntariness of Ayres' stationhouse statements. Ayres was found guilty on one of three counts with which he was charged, conspiracy to possess with intent to distribute. The First Circuit Court of Appeals affirmed his conviction, specifically holding that his stationhouse statements were voluntary and untainted by the previous, involuntary arrest statements. *United States v. Ayres*, 725 F.2d 806, 810–11 (1st Cir.) *cert. denied* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). Ayres subsequently began serving a six year prison sentence, and was paroled after serving approximately one and a half years of the sentence.

In November, 1986 Ayres was subpoenaed before a Federal Grand Jury in this district and refused to answer questions. On November 14, 1986 I granted a motion by the government to give Ayres use and derivative use immunity and to order Ayres to answer questions before the Grand Jury. Later that day Ayres appeared before the Grand Jury and, on the advice of counsel, declined to answer questions based on his Fifth Amendment privilege against self-incrimination. The government subsequently moved that Ayres be adjudged in civil contempt of this Court.

*Discussion*

Ayres contends that an immunized witness appearing before a Federal Grand Jury has a Constitutional right not to answer questions derived from his own involuntary statements. He relies on *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), which found just cause in a grand jury witness' refusal to answer questions derived from illegal monitoring of his telephone communications. *Gelbard's* holding rested on two interrelated grounds: first, the statutory language of 18 U.S.C. § 2515, which provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any ... proceeding in or before any ... grand jury ... if the disclosure of that information would be in violation of this chapter;" and second, the underlying policy objectives of 18 U.S.C. § 2515, clearly stated in the legislative history, "to protect effectively the privacy of oral and wire communications [and] to protect the integrity of court and administrative proceedings," *Gelbard* at 49, 92 S.Ct. at 2361–62.

Ayres distinguishes this case from *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which held that a Grand Jury witness lacks just cause to refuse to answer questions derived from evidence obtained in violation of his Fourth Amendment rights. *Calandra's* holding rested largely on the view that the purpose of the Fourth Amendment exclusionary rule "is not to redress the injury to the privacy of the search victim, ... [but rather] to deter future unlawful police conduct," *id.* at 347, 94 S.Ct. at 619, and that the deterrent function of the exclusionary rule would not be significantly enhanced by the rule's extension into the grand jury context, *id.* at 351–52, 94 S.Ct. at 621–22.

Ayres maintains that the fruits of one's involuntary statements implicate one's Fifth Amendment protection from coerced self-incrimination, rather than the mere prophylactic function of the Fourth Amendment exclusionary rule. On this basis, he contends that the instant case is governed by principles enunciated in *Gelbard* rather than those of *Calandra*.

Although *Calandra* sought to confine *Gelbard's* rationale to the federal wiretapping statute, 414 U.S. at 355 n. 11, 94 S.Ct. at 623, n. 11, I read *Gelbard* as resting at least in part on the vindication of personal privacy rights. This reading lends support to Ayres' argument that derivative use by a grand jury of evidence obtained in violation of his Fifth Amendment rights provides just cause for his refusal to answer questions. I am aware that the Ninth Circuit rejected this argument, en route to holding that an immunized grand jury witness may not refuse to answer questions derived from his prior involuntary confession, even if it was obtained through torture. *In re Weir*, 495 F.2d 879 (9th Cir.), *cert. denied* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974). But *Weir* omitted to consider whether *Gelbard* dictated a contrary result. Instead, the Ninth Circuit rested on a broad application of *Calandra* to all such grand jury situations, without regard to the nature of the underlying illegality. 495 F.2d 880–81.

I need not resolve these questions as to the validity of *Weir's* reasoning for purposes of the instant case, however, because the facts before the Court do not permit application of the theory presented by Ayres. The grand jury's questions of November 14, 1986 were based on Ayres' voluntary stationhouse statements, described *supra*, such that Ayres did not face any questions derived from prior violations of his Fifth Amendment rights.

It is true that, following my preliminary finding of voluntariness in Ayres' trial, the jury rendered no specific verdict as to the voluntariness of his stationhouse statements. And it is possible that the jury found those statements to be involuntary, disregarded them and found Ayres guilty of conspiracy solely on circumstantial evidence. But Ayres challenged the admissibility of his stationhouse statements on appeal, and the First Circuit ruled. that the

statements were admissible as a matter of law. *United States v. Ayres,* 725 F.2d 806, 810 (1st Cir.1984). Ayres maintains that the Appeals Court addressed only "the issue of whether the later statements were tainted by the initial statements, [and not] ... the separate question of the voluntariness of the subsequent statements." Ayres' memorandum in opposition to government's contempt motion at 8. In fact, the Court combined the two issues in one inquiry. In considering "whether [the] confession is a product of free will," 725 F.2d at 810, the Appeals Court utilized factors enunciated in *Brown v. Illinois,* 422 U.S. 590, 603–604, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), which established standards for determining whether a subsequent, voluntary confession is tainted by a previous, illegally obtained confession. Thus, although the Court of Appeals did not separate its voluntariness inquiry from the taint inquiry, both the explicit language and necessary premise of the decision makes clear the Appeals Court's opinion that the stationhouse statements were voluntary. This opinion, affirming my own preliminary findings of voluntariness, leaves me no basis on which to presume now that the statements were involuntary.

Ayres maintains, however, that I have a separate basis for disregarding the opinion of the Appellate Court. He contends that the Supreme Court recently changed the standards for determining the voluntariness of statements made subsequent to involuntary confessions, *see, Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and that I should apply the new standard retroactively to his stationhouse statements. I disagree.

I do not read *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), as having changed the standards for assessing the voluntariness of statements made subsequent to involuntary, incriminating statements. *Elstad* involved a burglary suspect who made incriminating statements incident to his arrest, in response to questioning unaccompanied by *Miranda* warnings. Later, at the stationhouse, Elstad was given *Miranda* warnings, waived

his *Miranda* rights and reiterated his previous incriminating statements. The second set of statements was admitted at trial, and he was convicted. On appeal, Elstad challenged the admission of the second set of statements on the ground that they were involuntary: by having "let the cat out of the bag", along with not knowing that the first statements were inadmissible at trial, Elstad waived his rights in the false belief that he had nothing further to lose by making additional statements. The Supreme Court rejected this argument, holding "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 U.S. 318, 105 S.Ct. at 1298.

Ayres contends that the Court embraced the cat-out-of-the-bag theory with respect to situations where the first statements are inadmissible not on *Miranda* grounds but on Fifth Amendment grounds, that is, where the first statements are the result of coercion on the part of the arresting officers. He derives this implication from dictum in *Elstad,* which noted, "absent deliberate coercion or improper police tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned statement does not warrant a presumption of compulsion." 470 U.S. at 314, 105 S.Ct. at 1296.

In isolation *Elstad's* dictum might support Ayres' theory. But the Court in *Elstad* made clear that it had no intention of changing the law governing the admission of statements made subsequent to coerced ones. In the first place, the Court cited with approval the precedent that first considered and rejected the theory that an involuntary statement renders all subsequent statements presumptively involuntary:

> As the Court remarked in *Bayer* [331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654]: "[A]fter an accused has once let the cat out of the bag by confessing, ... he is never thereafter free of the psychological and practical disadvantages of having

confessed.... But this Court has never gone so far as to hold that making a confession under circumstances that preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." 331 U.S. at 540–541, 67 S.Ct. at 1398. 470 U.S. 311, 105 S.Ct. at 1294–95. *See also, id,* at 311–312, 105 S.Ct. at 1295 (citing with approval "extreme cases ... in which police forced a full confession from the accused through unconscionable methods of interrogation [and] the Court has assumed that the coercive effect of the confession could, with time, be dissipated").

Second, the Court explicitly reaffirmed the doctrine that prior coerced statements do not per se require the exclusion of subsequent, voluntary statements; rather, the subsequent, voluntary statements are admissible if the "taint" of the initial constitutional violation has been purged by intervening circumstances: "[W]hen a prior statement is actually coerced, the time that passes between confessions, the change in the place of interrogations, and the change in the identity of the interrogators all bear on whether that coercion has carried over into the second confession." 470 U.S. at 310, 105 S.Ct. at 1294. This describes precisely the inquiry undertaken by the First Circuit with respect to Ayres' statements: "In this case, removing Ayres from the scene where he was originally questioned, giving him his *Miranda* warnings for a third time, and interrogating him by a different officer when he was relaxed, composed, and uncoerced could well have dissipated whatever taint may have infected his prior statements...." *United States v. Ayres,* 725 F.2d 806, 810 (1st Cir.1984).

Ayres maintains, however, that at least two other circuits have interpreted *Elstad* has having changed the analysis governing the admissibility of statements made subsequent to coerced statements. But the text of the cited cases does not bear out Ayres' argument. An Eleventh Circuit case cited by Ayres, reiterating dictum from *Elstad,* concluded that the cat-out-of-the-bag theory has no relevance where, "as in *Elstad,* the police used neither 'physical violence' nor 'other deliberate means' to coerce Martin's first confession." *Martin v. Wainwright,* 770 F.2d 918, 929 (11th Cir.1985), *modified, and reh'g denied en banc,* 781 F.2d 185 (11th Cir.1986). Although *Martin v. Wainwright's* language might support, by way of negative implication, an application of the cat-out-of-the-bag theory to statements following coerced confessions, the Eleventh Circuit has not yet walked that extra mile.

Another case cited by Ayres, decided by the Ninth Circuit, clearly reaffirms the continued validity of the pre-*Elstad* standards for assessing statements that follow coerced confessions:

> Under the Supreme Court's analysis in *Elstad,* in determining the admissibility of a defendant's statement given after the *Miranda* warning, the court should look first to determine whether the statement made by a defendant before the *Miranda* warning was actually coerced in violation of the fifth amendment. If it was, then the court must suppress the evidence unless the violation was sufficiently attenuated to permit the use of the evidence under the standards announced in *Brown.*

*United States v. Wauneka,* 770 F.2d 1434, 1440 (9th Cir.1985). In its review of this Court's admission of Ayres' stationhouse statements, the First Circuit employed the taint analysis of *Brown v. Illinois, supra,* and affirmed this Court's determination that the statements were both voluntary and purged of constitutional taint. *United States v. Ayres, supra.* That same analysis governs the issue today, with the result that Ayres' stationhouse statements must be deemed voluntary for purposes of the instant proceeding.

This finding renders irrelevant, for purposes of the instant motion, the theory under which Ayres claimed to have just cause for refusing to answer the grand jury's questions. That theory, discussed *supra,* would apply only if the grand jury's questions were the fruit of Ayres' involuntary statements. Since all of the grand jury's questions could be derived from Ayres' stationhouse statements, which were voluntary, the theory is inapposite.

Ayres therefore lacks just cause to refuse to answer the grand jury's questions.

For the present, however, I decline to enter contempt sanctions against Ayres. He was advised by counsel not to answer the grand jury's questions, and as this opinion makes abundantly clear, her advice was based on a significant and complex theory that this Court found inapplicable only after careful and lengthy review. Only now can it be said with assurance that Ayres' constitutional rights would not be violated by his being ordered to answer the grand jury's questions.

### Order

I hereby find that Robert Michael Ayres lacks just cause to refuse to answer grand jury questions derived from the voluntary statements he made concerning drug smuggling prior to his 1982 conspiracy conviction. I therefore order Robert Michael Ayres to appear before the Federal Grand jury that questioned him on November 14, 1986, if so requested by the government, and to answer all questions derived from those prior statements. I hereby charge Robert Michael Ayres with notice that his refusal to answer such questions will result in his being held in civil contempt of this Court.

So ordered.