**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 15, 2026

*Stephec, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 15, 2026

*Sarah Pendleton*
SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

CRISTIAN A. MAGANA-AREVALO,

Petitioner.

No. 103586-1

EN BANC

Filed: January 15, 2026

GORDON McCLOUD, J.—On December 1, 2018, at approximately 6:00 a.m., Renton police and special weapons and tactics (SWAT) team officers arrived at the apartment where Cristian Magaña Arévalo[1] was staying with his family. The officers used a bullhorn to order everyone out, separated Magaña Arévalo from his partner and young child, zip-tied his wrists behind his back, put him into a patrol car, drove him to a parking lot filled with law enforcement officers, and transferred him from the patrol car to a different officer's work truck. Then—without providing *Miranda*[2] warnings—an officer said he was "not under arrest" but asked whether he would be willing to talk to them.

---

[1] When referring to the petitioner, we follow the way the petitioner spells and formats his name in his most recent briefs in this court.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Given those circumstances, Magaña Arévalo said he was willing.

The topic was the recent murder of Jason Hobbs. Magaña Arévalo talked to them extensively about that. Then he talked to them again, at their request, two days later, in a very different noncustodial setting, but still without *Miranda* warnings.

The trial court admitted all of his statements into evidence at trial.

The trial court erred. Statements elicited through custodial interrogation are inadmissible at trial unless law enforcement provides *Miranda* warnings, and the subject waives those *Miranda* protections, first. To determine whether an interrogation is custodial, courts must consider the totality of the circumstances— not just one officer's conclusory assertion that the suspect is "not under arrest." Under that totality of circumstances test, which cannot ignore the suspect's race or ethnicity, Magaña Arévalo was in custody during his interrogation on December 1. The trial court's decision to admit his non-*Mirandized* statements from that date therefore violated *Miranda*, and the remedy is suppression of those statements.

The next question is whether that December 1 *Miranda* violation tainted the non-*Mirandized* but noncustodial interrogation on the same topic, by the same officer, two days later (on December 3). To answer that question, courts applying federal constitutional law start with the general federal constitutional rule that an initial *Miranda* violation does not taint separate, later, voluntary statements. Courts

then ask whether the defendant has identified an applicable exception to that rule.[3]

Magaña Arévalo identifies no applicable exception to that general federal constitutional rule, and he has not argued for a state constitutional exception, either. As a result, the trial court's decision to admit the non-*Mirandized* December 3 statement into evidence must be affirmed.

Finally, we consider whether the prejudicial impact of the unconstitutionally admitted December 1 statement necessitates reversal. Our court has sometimes used different language to describe the proper test for deciding whether a constitutional error like this one is harmless. But most of our cases actually apply the same test in practice: we consider (1) the corrosive impact of the constitutional error (here, the improperly admitted evidence), including its impact on how the fact finder might consider even the properly admitted evidence, as well as (2) the strength of the properly admitted evidence of guilt. Considering the impact of both types of evidence, we then ask whether the State has carried its burden of proving that the constitutional error was harmless beyond a reasonable doubt.

Applying that test here, Magaña Arévalo's unconstitutionally admitted December 1 statements were contradictory, evasive, inculpatory, and thus highly

---

[3] Examples of exceptions to the general rule that an initial *Miranda* violation does not taint a later, voluntary, and otherwise proper interrogation, include (1) police use of actual compulsion or (2) police employment of the "two-step" procedure for avoiding *Miranda* that the Court condemned in *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (plurality opinion).

prejudicial. But his properly admitted statement from December 3, and his actual testimony at trial, repeated the bulk of that December 1 statement. In addition, the State presented physical evidence (including video of the crime, with a truck that looked like Magaña Arévalo's at the scene) that provided strong, independent evidence of guilt.

We therefore affirm the Court of Appeals. Specifically, we affirm its holding that considering the totality of the circumstances, law enforcement officers subjected Magaña Arévalo to custodial interrogation on December 1. The trial court's failure to suppress statements elicited by that interrogation therefore violated the Fifth and Fourteenth Amendments. U.S. CONST. amends. V, XIV. We also affirm its holding that the statement obtained two days later in a separate, noncustodial, voluntary setting was admissible.

Finally, we affirm the Court of Appeals' holding that the error was harmless beyond a reasonable doubt. But we clarify the description of the proper harmless-beyond-a-reasonable-doubt test. Under the proper test, the reviewing court must consider whether the State has carried its burden of proving that a constitutional error (like the unconstitutional admission of evidence in this case) is harmless beyond a reasonable doubt by considering *both* (1) the strength of the properly admitted evidence of guilt *as well as* (2) the inculpatory or prejudicial impact of the unconstitutionally admitted evidence on even the properly admitted evidence. The

court must then ask whether, considering both the properly admitted evidence and the impact of the improperly admitted evidence, the State has proved the error was harmless beyond a reasonable doubt. Applying that test, we agree with the Court of Appeals that the State has carried its burden in this case.

FACTS AND PROCEDURAL HISTORY

I.      Factual background

   *A. November 30, 2018: Hobbs is murdered*

Hobbs was shot to death outside an apartment complex on November 30, 2018. Clerk's Papers (CP) at 295 (Findings of Fact & Conclusions of L. re Admissibility of Def.'s Statements (FFCL)). Surveillance video from a nearby residence captured Hobbs's murder. *Id.* at 322. The footage revealed the following: Hobbs arrived at the complex shortly before 6:00 p.m. He backed his blue Volkswagen Jetta into a parking space. Ex. 7, pt. 1. About 30 minutes later, at 6:29 p.m., a dark-colored sports utility vehicle (SUV) with distinctive aftermarket rims (later linked to Magaña Arévalo) drove past Hobbs's parking space; Hobbs followed the SUV on foot; less than 2 minutes later, two men attacked Hobbs. *Id.* at pts. 8, 10.

One of the men wore a two-toned jacket and dark pants; the other wore a hoodie with a dark vest. *Id.* at pt. 10. Hobbs tried to get away, but the man in the two-toned jacket pulled out a gun and shot Hobbs at close range. *Id.* Hobbs fell. The man in the two-toned jacket briefly walked away but then returned to shoot Hobbs

5

several more times before he fled. *Id.* Hobbs died at the scene. *Id.* Renton Police Department (RPD) investigated and identified Magaña Arévalo as a person of interest. 2 Rec. of Proc. (RP) (May 5, 2022) at 958-61 (detective's trial testimony).

### B. *December 1, 2018: Magaña Arévalo's first statement to police*

On December 1 at approximately 6:00 a.m., RPD arrived at the home of Magaña Arévalo's partner, Julissa Norvell, with a warrant to search her apartment and Magaña Arévalo's vehicle, and to obtain his DNA. CP at 296, 324; 2 RP (May 5, 2022) at 962-63. A SWAT team assisted RPD in executing the search warrant. CP at 296.

When police arrived at Norvell's apartment, they used a megaphone and ordered Magaña Arévalo and his family to come out. *Id.* Magaña Arévalo, Norvell, and their young son complied. *Id.*

Law enforcement immediately separated Magaña Arévalo from his family, zip-tied his wrists, stood him outside for a few minutes, and then placed him in an RPD patrol car. *Id.* The officer in the patrol car then drove Magaña Arévalo, who remained zip-tied, to a "staging area" in a grocery parking lot about a block away. *Id.*

They arrived at the staging area at approximately 6:44 a.m., and several law enforcement officers were waiting. Detective Chris Edwards, dressed in plain clothes, met Magaña Arévalo at the patrol car. *Id.* at 296. Edwards removed Magaña

Arévalo from the patrol car, introduced himself, and removed the zip ties. *Id.* at 296-97. The detective then told Magaña Arévalo that RPD wanted to discuss "some things" with him. Magaña Arévalo again complied. *Id.* at 297. Edwards gave Magaña Arévalo the option of traveling to the police station to talk or remaining at the staging area in the grocery store parking lot to talk. *Id.* Given those two options, Magaña Arévalo chose to talk in the staging area to be closer to his family. *Id.*

Edwards interviewed Magaña Arévalo in the back of his unmarked work truck. *Id.* Another detective, Jason Renggli, sat in the front seat in plain clothes. *Id.* The truck had no divider or "cage" partition inside. *Id.* at 298.

Before recording this first interview, Edwards told Magaña Arévalo that he "was not under arrest and was free to leave at any time." *Id.* Magaña Arévalo acknowledged Edwards's remarks and gave consent to record the interview. *Id.*

Edwards recorded that interview between 6:47 a.m. and 7:08 a.m. Once the taping began, Edwards again stated that Magaña Arévalo "was not under arrest and . . . was free to leave at any time." *Id.*

In response to questioning, Magaña Arévalo told Edwards that before Hobbs's murder, he had heard that Hobbs had shot at Magaña Arévalo's uncle's home while Magaña Arévalo's partner and child were there. 3 RP (May 9, 2022) at 1138, 1144, 1152. Magaña Arévalo also told Edwards about his relationship and history with Hobbs; his relationship with his own brother, Jose; and the fact that he owned two

7

cars (one of which was similar to the SUV videotaped at the murder scene) and where those cars were located. *Id.* This interview ended at 7:08 a.m.

Edwards then resumed the interview a few minutes later to clarify information discussed just moments earlier. CP at 298. Edwards recorded this resumed interview, also; it ended at 7:14 a.m. *Id.* at 298-99. This time, Edwards asked Magaña Arévalo about the fact that he had encountered Hobbs at a Subway restaurant shortly before the shooting. 3 RP (May 9, 2022) at 1161-62. Magaña Arévalo failed to mention this encounter to the detective before. *Id.* at 1161. Magaña Arévalo acknowledged the encounter with Hobbs at Subway but initially characterized it as "cordial" and "just [a] regular conversation," with "no mentions about" any problems with Hobbs. *Id.* at 1163-64. But as the interview progressed, Magaña Arévalo added that Hobbs was "trying to threaten [his] life." *Id.* at 1165.

Neither Edwards nor Renggli gave Magaña Arévalo *Miranda* warnings on December 1. CP at 299. After the interrogation ended, and after the police finished their search, Edwards took Magaña Arévalo back to Norvell's apartment. *Id.*

*C. December 3, 2018: Magaña Arévalo's subsequent statement to police*

Two days later, on December 3, 2018, Edwards called to arrange another interview, and Magaña Arévalo again complied. This subsequent interview was set for Norvell's apartment. *Id.* at 300. Edwards and another agent arrived in plain clothes, explained that they had follow-up questions, and were invited in. *Id.* Magaña

Arévalo agreed to answer their questions. *Id.* Edwards recorded this interview, also. Magaña Arévalo was not restrained, was not arrested, and was still not advised of his *Miranda* rights. *Id.* at 300-01. At this point, the parties do not dispute the lower courts' conclusions that this December 3 interrogation was voluntary and noncustodial.

In this interview, Magaña Arévalo repeated details of his activities on the day of the murder. He acknowledged the detective's assertion that the reason the police were interviewing him again was that Magaña Arévalo's truck (or "a vehicle like it") "was seen leaving the scene of a homicide." CP at 118, 143. He again described his encounter with Hobbs at Subway. He repeated his statement that he knew Hobbs had shot at his uncle's home while his partner and son were there. 3 RP (May 10, 2022) at 1467-78; CP at 104. Magaña Arévalo also reiterated his statement from December 1 that he did not like guns and that he did not own any guns. 3 RP (May 9, 2022) at 1162, *id.* (May 10, 2022) at 1477-78.

Edwards then confronted Magaña Arévalo with the information that law enforcement found a gun magazine at the crime scene and asked him if his DNA would be on it. Magaña Arévalo stated for the first time that he did know about that magazine: "[W]hen I found the gun case[,] there was actually a magazine in there but I got rid of that magazine." 3 RP (May 10, 2022) at 1480-81. Magaña Arévalo gave Edwards varying accounts of how he got rid of the magazine. *Id.* at 1481-82.

First he said that he "sold it to someone else." *Id.* at 1481. Then he said that he "just gave it away to someone." *Id.* Finally, he said that his brother, Jose, sold the magazine. *Id.* at 1488. Magaña Arévalo did not receive *Miranda* warnings this time, either, and he did not independently ask for an attorney, invoke his right to remain silent, or try to stop the interview. CP at 300-01.

II.      Proceedings at trial

On December 12, 2018, the State charged Magaña Arévalo with first degree murder of Hobbs. CP at 1.

Magaña Arévalo moved to suppress statements the police elicited from him during the December 1 and December 3 interrogations. 1 RP (Apr. 28, 2022) at 334-35. He argued that his December 1 statements were elicited during custodial interrogation without *Miranda* warnings and that the remedy for that violation is suppression. *Id.* at 331-35. He further argued (in relevant part) that his December 3 statement was tainted by the earlier *Miranda* violation and that the remedy for that violation was also suppression.

The trial court held a CrR 3.5 hearing to determine the admissibility of Magaña Arévalo's statements. Magaña Arévalo and Edwards both testified, resulting in the FFCL described at pages 5-10 above. CP at 295-303. The trial court ruled that all of Magaña Arévalo's statements were admissible because (1) Magaña Arévalo was not in custody during either interrogation, (2) Magaña Arévalo was not

coerced during either interrogation, and, hence, (3) no *Miranda* warnings were required before either interrogation. CP at 302-03.

The State used all the statements against Magaña Arévalo at trial. It played segments of Magaña Arévalo's recorded interviews from December 1 and December 3 in its case-in-chief, in its direct examination of Edwards, in cross-examination of Magaña Arévalo, and in closing argument. 5 RP (May 24, 2022) at 2121-22, 2125-26, 2133-34.

With respect to the December 1 statement, during direct examination of Edwards, the prosecutor played the portion of the December 1 statement in which Magaña Arévalo acknowledged that he knew that people had shot at his uncle's house and claimed that he did not want to be involved:

> I'm—I'm—it's—I'm surprised about the situation, too, 'cause you know, I didn't know—I didn't —I didn't, myself, want to be involved in that—all that situation. 'Cause I know that there's—it's—it's about, um, a few people that shot at my uncle's house, before.
>
>  . . . .
>
> That's the reason why I stay away from everybody . . . .

CP at 91 (Pretrial Ex. 9); 3 RP (May 9, 2022) at 1138.

As another example, during direct examination of Edwards and in closing, the State played the portion of that December 1 statement in which Magaña Arévalo

11

admitted that he knew Hobbs and knew that Hobbs had shot up his uncle's house

while his partner and child were inside:

> I've known him, um, because his . . . cousin, (Tyrell), is the—one of
> the people that were involved with the shooting of—at my house and
> stuff.
>
> . . . .
>
> And . . . a[n] officer actually brought him [Hobbs] up, too, when I was
> talkin' to them about the shooting at my house. 'Cause they shot when
> my baby mama was outside the house . . . .
>
> . . . .
>
> . . . [T]hey shot at my baby mama. They shot at my kid. He was inside
> the car. And I was . . . at the moment, I was . . . I was helping someone
> with the job and stuff, and she [Norvell] calls me tellin' me about the
> shooting and stuff.

CP at 103-04; 3 RP (May 9, 2022) at 1152; 5 RP (May 24, 2022) at 2120-23.

The prosecutor played the portion of the December 1 statement in which

Magaña Arévalo responded to Edwards's question about Hobbs's gun: "Well, 'cause

[Hobbs] was just like, '. . . I wasn't a part of that shooting that happened at your

uncle's house.'" CP at 113; 3 RP (May 9, 2022) at 1164. Magaña Arévalo also said,

"[Hobbs] didn't show me no gun but he pointed at his car and he was like, . . . I keep

my gun tucked and stuff and I was just like, 'Well, okay. That's fine.'" CP at 113; 3

RP (May 9, 2022) at 1164. The State also played a portion of this statement during

closing argument. 5 RP (May 24, 2022) at 2133.

Finally, the prosecutor played the portion of Magaña Arévalo's December 1 statement in which Magaña Arévalo told Edwards about Hobbs's demeanor during their encounter at Subway: "He looked like he was like—I don't know . . . kind of . . . threatening me saying that he has his gun tucked and I was just like, 'Okay. Good for you.' . . . I was like, 'You see I'm with my family right now . . . I don't do that—none of that street stuff.[']" CP at 114 (Pretrial Ex. 10); 3 RP (May 9, 2022) at 1165-66.

But the State also used parts of Magaña Arévalo's December 3 statement at trial, and they contained the same inculpatory information. In its direct examination of Edwards, for example, the prosecutor played the portion of that statement in which Magaña Arévalo again described the encounter at Subway with Hobbs, conveying basically the same information: "Yeah they stopped right behind us and stuff. And they were—they were tryin' to talk to me and stuff. I wasn't really tryin' to talk to them because I'm already, like, scared as it is. . . . There was some stuff goin' on about them shootin' at my Uncle's house. . . . And I just didn't want them to try to do anything to me." CP at 121 (Pretrial Ex. 11); 3 RP (May 10, 2022) at 1467-68.

The prosecutor played the portion of that December 3 statement in which Magaña Arévalo described how Hobbs bragged about shooting at his uncle's home, conveying even more information bearing on his own motive to harm Hobbs:

13

And, um, supposedly (Jason [Hobbs]) was—was like laughing about it sayin' that he was involved—sayin' that he was one of the shooters that shot at my house and all that. . . .

. . . .

Like, he was, like, braggin' about that . . . he was one of the main ones and all that. . . I don't know what's really—what really happened with all that.

. . . .

I don't know if it was really them or not.

. . . .

[I]f their [sic] mentioning my house and them shooting up my house and, obviously, they have something to do with it.

CP at 122; 3 RP (May 10, 2022) at 1469. The prosecutor played this statement again in closing argument. 5 RP (May 24, 2022) at 2122.

Finally, the prosecutor played the portion of the December 3 statement in which Magaña Arévalo explained why he believed Hobbs shot at his uncle's home, that is, because of a dispute with his family: "[I]t wasn't my problem at the time. It was actually because they we—they were having problems with my brother. . . . I don't know, it's just a bunch of, like . . . beef." CP at 123-24; 3 RP (May 10, 2022) at 1471.

14

The jury convicted Magaña Arévalo as charged. CP at 183-84. The trial court sentenced him to 320 months in prison on the first degree murder conviction and 60 months consecutive on the firearm enhancement. *Id.* at 267.

III.    Proceedings on appeal

The Court of Appeals affirmed. *State v. Magaña-Arevalo*, No. 84259-5-I, slip op. at 2 (Wash. Ct. App. Aug. 26, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/842595.pdf. It agreed with the trial court's conclusion that Magaña Arévalo's December 1 statement to Edwards was voluntary. But it concluded that Magaña Arévalo *was* in custody when Edwards interrogated him on that day. *Id.* at 21-24. The appellate court therefore held that the trial court erred in admitting Magaña Arévalo's December 1 statement as substantive evidence. And it concluded that the error was harmless beyond a reasonable doubt, given the fact that Magaña Arévalo's admissible December 3 statement and trial testimony, along with the State's other evidence, provided overwhelming proof of guilt. *Id.* at 40.

Magaña Arévalo petitioned for review of the appellate court's rulings on harmless error and on the admissibility of his December 3 statement. The State cross petitioned for review of the appellate court's ruling that the December 1 interrogation was custodial. We granted review of both petitions. Ord., *State v.*

*Magaña-Arevalo*, No. 103586-1 (Wash. Mar. 7, 2025); Am. Ord. (Wash. Mar. 17, 2025).

## ANALYSIS

I. Considering the "totality of the circumstances"—not just one officer's statement that he was "not under arrest"—Magaña Arévalo's December 1 statements were elicited during custodial interrogation without *Miranda* warnings; they should have been suppressed

In *Miranda*, the Supreme Court ruled "that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated." *United States v. Patane*, 542 U.S. 630, 639, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (citing *Dickerson v. United States*, 530 U.S. 428, 434-35, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *Miranda*, 384 U.S. at 467). To protect against this risk, "the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *Id. Miranda* warnings are designed to counteract this risk.

*Miranda* warnings need not precede all police interrogations. But *Miranda* warnings must be given—and *Miranda* rights must be waived—in advance of custodial interrogations. 384 U.S. at 444. Thus, the first question presented here is

whether Magaña Arévalo's December 1 statement was elicited through custodial interrogation.[4]

A suspect is in custody when their "freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (per curiam)).

When making this determination, we apply an objective standard that asks whether, under the totality of the circumstances, a reasonable person in the suspect's position would have felt free to end the interrogation and leave. *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012); *see also Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995); *State v. Escalante*, 195 Wn.2d 526, 533, 461 P.3d 1183 (2020).

The totality of the circumstances includes, but is not limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Fields*, 565 U.S. at 509 (citations omitted); *see also Escalante*, 195 Wn.2d at 534. The "totality of circumstances" inquiry also includes, but is not limited to, each of the factors discussed below.

---

[4] We review the Court of Appeals' custody determination de novo. *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).

> *A. Interrogation by law enforcement in a police-controlled location weighs in favor of a finding of custody*

One factor to consider in the totality of the circumstances analysis is whether the interrogation occurred in a police-controlled location. Interrogation in a police-controlled location points toward a custodial environment. *See United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (demonstrating that the criminal suspect in that case was subject to questioning while "in [an] FBI vehicle" with two armed FBI agents); *People v. Holt*, 233 P.3d 1194, 1199 (Colo. 2010) (demonstrating that the suspect in that case was interrogated inside a police car rather than in a neutral location); *People v. Howard*, 92 P.3d 445, 452 (Colo. 2004) (noting that interrogations conducted in neutral locations, like a suspect's home, are generally less coercive than those held in police-controlled environments); *State v. Preston*, 411 A.2d 402, 405 (Me. 1980) (observing that police officers increase "the coercive nature of [an] interrogation" when they question a suspect "alone in an official police car").

In this case, law enforcement officers executed a search warrant and set up a staging area to interview Magaña Arévalo at approximately 4:50 a.m. 1 RP (Apr. 28, 2022) at 280. A SWAT team and approximately 10 police officers arrived at Magaña Arévalo's partner's residence while nearly 20 to 30 law enforcement units gathered at the staging area. *Id.* at 276-83. A SWAT officer at the residence used a megaphone

to order Magaña Arévalo out of the home. *Id.* at 283. The SWAT team yelled over the megaphone that if Magaña Arévalo did not leave voluntarily, they would forcefully enter. *Id.* at 297-98. When Magaña Arévalo came out, law enforcement officers restrained him, tied his hands behind his back with zip ties, placed him in a patrol car, and drove him to the staging area. *Id.* at 304-05. Magaña Arévalo then spent approximately 40 to 45 minutes alone, without access to communication or contact with others, until Edwards met him. 1 RP (Apr. 27, 2022) at 253.

Upon meeting Magaña Arévalo, Edwards presented him with two choices: they could question him at the police station or they could question him in the "work truck." *Id.* at 151-53. Given those two choices, Magaña Arévalo chose to be questioned in the work truck, which was parked in the staging area, where other police cars and officers parked and stood outside. *Id.* at 152-53, 185-87. During the interview, Edwards sat with Magaña Arévalo in the back seat and Renggli sat in the front seat. 1 RP (Apr. 28, 2022) at 263, 286. Both detectives were armed. *Id.* at 286.

This interrogation occurred in a police-controlled environment, following a police-compelled exit from his home. Thus, it weighs in favor of a finding of custody.

### B. Isolation from family weighs in favor of a finding of custody

Another factor to consider in the totality of circumstances analysis is whether law enforcement isolated the suspect from friends and family. Such isolation points

19

toward custody. *See United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (observing that defendant was in custody because "he was separated from his family and interrogated by two federal agents."); *United States v. Revels*, 510 F.3d 1269, 1275-76 (10th Cir. 2007) (recognizing that "the nature of the questioning indicates that [defendant] was in custody" because "[o]fficers purposefully separated [defendant] from her boyfriend and children and removed her to a back room"); *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) (defendant-wife was separated from husband and police officers prevented him from joining her while they questioned her inside of her shop); *Holt*, 233 P.3d at 1199 (police isolated defendant from his fiancée when interrogated).

Here, it is undisputed that law enforcement officers isolated Magaña Arévalo from his family. Magaña Arévalo requested to see them several times, but the officers denied his request. 1 RP (Apr. 28, 2022) at 300-01. Edwards testified that it was normal to wake a suspect and their family up and to separate a suspect "from other family members." *Id.* at 282-83. But normal or not, it weighs in favor of a finding of custody.

### C. Police conduct that involves waking the suspect or restricting the suspect's movement weighs in favor of a finding of custody

Other factors that courts must consider under the totality of the circumstances include whether law enforcement unexpectedly woke the suspect, restrained the

suspect, or searched the home in which the suspect was sleeping. All of those factors weigh in favor of a finding of custody. *See Cavazos*, 668 F.3d at 194 (concluding that defendant was in custody when officers woke the defendant and handcuffed him while over a dozen officers searched his residence); *Revels*, 510 F.3d at 1275-76 (defendant was in custody when seven police officers forcefully entered her home at 6:00 a.m., woke her, handcuffed her, and placed her on the floor); *Holt*, 233 P.3d at 1197 (defendant was in custody when six to nine police officers entered his apartment and restrained him with handcuffs).

All of these circumstances were present here. As discussed above, law enforcement woke Magaña Arévalo up at 6:00 a.m. with a megaphone, ordered him out, zip-tied him when he emerged, separated him from his family, forced him into a police car, and drove him to the staging area. 1 RP (Apr. 28, 2022) at 283, 297-98, 304-05. This factor also supports a finding that Magaña Arévalo was in custody.

### D. Confrontation by law enforcement with incriminating evidence of guilt weighs in favor of a finding of custody

A reasonable person would also likely perceive themselves to be under arrest, and thus in custody, when confronted by police with incriminating evidence of guilt. *See Revels*, 510 F.3d at 1276 ("[a]fter being confronted with the drugs in an *accusatory manner*, we have no doubt that [defendant] would have reasonably felt compelled to cooperate with the police" (emphasis added)); *United States v. Lee*,

699 F.2d 466, 468 (9th Cir. 1982) (finding that defendant was in custody when FBI agents presented him with evidence of guilt, urged him to confess, and failed to provide *Miranda* warnings).

Here, Edwards confronted Magaña Arévalo with evidence that law enforcement "[has] a video of a very serious crime that leads us to believe that [the] vehicle that you own is involved." 1 RP (Apr. 27, 2022) at 168. Renggli told Magaña Arévalo that "it's best to be up front and honest with us . . . now instead of lie to us and then we find out something later, right?" *Id.* at 175. Similarly, Edwards told Magaña Arévalo, "I don't want you to sit there and . . . tell us some line of crap right now . . . and then we find out something different later." *Id.* at 176. Accordingly, this factor also weighs in favor of a finding of custody.

### E. Magaña Arévalo's ethnicity and age weigh in favor of a finding of custody

Magaña Arévalo argues, and the Court of Appeals held, that the court may consider evidence of the suspect's race and ethnicity in the totality of circumstances analysis. *Magaña-Arevalo*, No. 84259-5-I, slip op. at 14 n.7; Suppl. Br. of Pet'r at 13-17.

The State agreed with the Court of Appeals on this point when it briefed this case. State's Resp. to Br. of Amici Curiae Ctr. for C.R. & Critical Just. et al. at 9-15. But it changed its position at oral argument. At that point, the State asserted for the

first time that race and ethnicity are not appropriate factors to consider in the totality of circumstances analysis. Wash. Sup. Ct. oral arg., *State v. Magana-Arevalo*, No. 103586-1 (May 29, 2025), at 22 min., 18 sec. to 22 min., 33 sec., *video recording by TVW, Washington State's Public Affairs Network*, https://tvw.org/video/washington-state-supreme-court-2025051178/.

The State's initial position was correct. The United States Supreme Court has established that in determining whether a suspect is in custody under *Miranda*, we must "'examine all of the circumstances surrounding [an] interrogation,' including *any circumstance* that 'would have affected how a reasonable person' in the suspect's position 'would perceive [their] freedom to leave.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (emphasis added) (citation omitted) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)).

The Court in *J.D.B.* therefore ruled that courts should consider a child's age in the totality of circumstances analysis because, objectively viewed, a reasonable child may feel greater pressure to submit to police authority than would a reasonable adult. *Id.* at 272.

Other courts applying federal constitutional law have said the same thing about race or ethnicity; they recognize that objectively viewed, these factors can also be relevant "to the question of whether a seizure occurred." *United States v. Smith*,

794 F.3d 681, 688 (7th Cir. 2015) (quoting *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)); *see United States v. Washington*, 490 F.3d 765, 768, 773 (9th Cir. 2007) (considering "[r]ecent relations between police and the African-American community in Portland," in particular "the publicized shootings by white Portland police officers of African-Americans," under the totality of circumstances when analyzing whether African-American defendant was seized).

We used a similar totality of the circumstances analysis in *State v. Sum*, 199 Wn.2d 627, 639, 643, 511 P.3d 92 (2022). We held that race and ethnicity are relevant factors for the court to consider when doing an objective assessment of the totality of circumstances to determine whether a person has been seized. We recognized that "an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force" against people of color in Washington. *Id.* at 653.

We apply the same objective-observer/totality-of-circumstances analysis when assessing whether Magaña Arévalo was in custody on December 1. As the court explained in *Washington*, 490 F.3d at 773, applying federal constitutional law, that means considering how an objective observer would view the relationship between members of the defendant's community and law enforcement, considering

24

factors such as police shootings. In Washington, between 2013 and 2020, Latinos were killed by police at a rate 1.3 times greater than non-Hispanic white people, and police use-of-force rates, stop rates, and incarceration rates of Latinos are all higher than the rates of their non-Latino counterparts.[5]

---

[5] FRED T. KOREMATSU CTR. FOR LAW & EQUALITY, RACE & CRIMINAL JUST. SYST., TASK FORCE 2.0: RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT (2021), https://digitalcommons.law.seattleu.edu/korematsu_center/116/ [https://perma.cc/D5C4-4HHA]; *see also* BRIAN CRIST ET AL., SHERIFF'S OFFICE DATA SHOWS RACIAL DISPARITIES, POTENTIAL TO EXPAND ALTERNATIVE POLICING 8-9 (June 14, 2022) (finding that the King County Sheriff's Office use-of-force rate against Hispanic people was approximately 50 percent higher than for other racial groups, including White people), https://kingcounty.gov/~/media/depts/auditor/new-web-docs/2022/calls-for-service-2022/cfs-2022.ashx?la=en [https://perma.cc/7JM5-LBDR]; CRISTINA SANDERS ET AL., REPORT TO THE WASHINGTON STATE PATROL 1, 46 (analyzing 2015-2019 Washington State Patrol stops and finding Hispanic drivers overrepresented in stops in certain counties relative to their population and reporting Hispanic drivers are searched at higher rates), https://www.wsp.wa.gov/wp-content/uploads/2022/02/WSP-Bias-Traffic-Stop-Study_2021.pdf [https://perma.cc/8KQE-WV76]; MYLES MOORE & MADELEINE DARDEAU, JUST. CTR., COUNCIL OF STATE GOV'TS, WASHINGTON CRIMINAL JUSTICE DATA SNAPSHOT 34 (Dec. 2023) (reporting that Latino adults in Washington are 39 percent less likely to be on probation, 1.5 times more likely to be in prison, and 1.4 times more likely to be on parole when compared to White adults), https://app.leg.wa.gov/committeeschedules/Home/Document/263156 [https://perma.cc/KJ74-FAE4]; DEP'T OF CORR., AGENCY FACT CARD 1 (June 2025) (reporting that as of June 30, 2025, Hispanic individuals of all races accounted for 2,225 inmates, approximately 15.9 percent of the total confinement population), https://doc.wa.gov/sites/default/files/2025-02/100-RE005.pdf [https://perma.cc/CN93-X3G2]; DEP'T OF CORR. RSCH. & DATA ANALYTICS UNIT, ETHNICITY BREAKDOWN 1 (June 2022) (finding Hispanics at 21.5 percent of the state prison population out of a total population of 11,577), https://doc.wa.gov/sites/default/files/2025-02/2022-0602-ethnicity-breakdown.pdf [https://perma.cc/L39M-445U].

How do we weigh this factor? Our court in *Sum* explained how to consider race and ethnicity when applying the totality of circumstances analysis to determine whether a person is "seized" by police. We explained that people of color "are subject to excessive police contacts, investigative seizures, and uses of force by law enforcement." *Sum*, 199 Wn.2d at 651. We continued that communities of color "as a whole, [are] generally well aware of such patterns of excessive police scrutiny. As a result, 'generations of children have had to grow up with "the Talk,"' in which parents must educate their children 'about how to interact with law enforcement so no officer will have any reason to misperceive them as a threat and take harmful or fatal action against them.'" *Id.* (quoting *United States v. Knights*, 989 F.3d 1281, 1297 & n.8 (11th Cir. 2021) (Rosenbaum, J., concurring)). We concluded, "'Against that awareness' an encounter with law enforcement would certainly feel 'more pointed and coercive.' Thus, '[t]he fear of harm and resulting protective conditioning to submit to avoid harm at the hands of police is relevant to whether there was a seizure *because feeling 'free' to leave or terminate an encounter with police officers is rooted in an assessment of the consequences of doing so*.'" *Id*. at 651 (emphasis added) (alteration in original) (citation omitted) (quoting *Dozier v. United States*, 220 A.3d 933, 943, 944 (D.C. 2019)).

Magaña Arévalo's Latino ethnicity cannot be ignored in the objective-observer/totality-of-circumstances analysis. Like all the other factors listed above, it also militates in favor of a finding of custody.

> *F. An officer's statement that a suspect is free to leave does not alone dispel other indicia of custody; we must consider the totality of the circumstances, not just one single comment*

The State contends that Magaña Arévalo was not in custody because Edwards told him, before the interrogation, that he was free to leave and not under arrest. State's Answer to Pet. for Rev. at 23-24; Suppl. Br. of Resp't at 19, 21.

This is certainly a factor to consider. But whether a person is in custody does not turn solely on this single factor, any more than it turns on any other single factor. *See United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (despite law enforcement's statement that Hashime was free to leave, "that by itself does not make the interrogation non-custodial" because "[t]he broader setting makes clear why a few isolated statements by law enforcement . . . cannot erase its custodial nature" when officers woke Hashime up at gunpoint and restricted his movement); *Lee*, 699 F.2d at 467-68 (interrogation in police car was custodial despite defendant being told he was free to leave because it was in an "FBI car with two officers for well over an hour while police investigators were in and around [defendant's] house"); *Preston*, 411 A.2d at 405-06 (even though officer assured defendant that he was free to leave, officer's accusatory statement about defendant possessing stolen

27

goods, which contributed to "the potential for creating [a] coercive atmosphere [thereby] trigger[ing] the requirement of the *Miranda* warnings," showed that he was actually in custody); *State v. Dennis*, 16 Wn. App. 417, 421-22, 558 P.2d 297 (1976) (despite officer's assurance that defendant was "free to leave at any time," defendant's environment was dominated by officer's presence and officer could "restrict [defendant's and his wife's] freedom of movement within their home").

The State rests its argument to the contrary on a single Washington case, *State v. Lorenz*, 152 Wn.2d 22, 93 P.3d 133 (2004). In that case, a jury convicted Pamela Lorenz of sex crimes against minors. *Id.* at 25. She appealed, arguing in part that her inculpatory written statement should have been suppressed because it was the product of non-*Mirandized* custodial interrogation. But when law enforcement executed a search of her home, they did not arrest or physically restrain her. *Id.* at 27. They did not zip-tie or handcuff her, they did not drive her anywhere, and they did not forcibly separate her from friends or family. They let her wait on her porch, and they advised her that she was not under arrest and that she could leave at any time. *Id*. Lorenz signed an affidavit acknowledging that advisement. *Id.* Based on all of these facts—in other words, based on the totality of circumstances and not just one officer's comment—we affirmed the trial court's findings that officers did not subject *Lorenz* to custodial interrogation. *Id.* at 38.

This case is different. As discussed above, law enforcement physically restrained Magaña Arévalo, separated him from family, surrounded him with police, ordered him up and out of his house, and drove him away from his home and family. 1 RP (Apr. 28, 2022) at 304-05, 299-300, 276-83. Accordingly, regardless of Edwards's statement to Magaña Arévalo that he was free to leave and not under arrest, everything else showed that he was in custody.[6]

### G. *The trial court erred in admitting Magaña Arévalo's December 1 statement as substantive evidence*

*Miranda* bars the trial court from admitting such statements that were elicited through custodial interrogation, without appropriate warnings and waiver, as substantive evidence at trial. 384 U.S. at 479; *see also Escalante*, 195 Wn.2d at 532. The State now concedes that Magaña Arévalo's December 1 and December 3 statements were admitted as substantive evidence. Suppl. Br. of Resp't at 26-30. We agree. Many of those statements, for example, bore on the issue of motive and intent, and the State used those statements to great effect at trial. *See* pp. 10-14 *supra*. The trial court's decision to admit that December 1 statement therefore violated *Miranda* and the Fifth and Fourteenth Amendments.

---

[6] The State also relies on the fact that Magaña Arévalo spoke to Edwards for less than 27 minutes while officers searched Norvell's apartment pursuant to the search warrant. Suppl. Br. of Resp't at 20-21. But the duration and character of the questioning is only one factor among many in the totality of circumstances analysis. *See McCarty*, 468 U.S. at 437-38.

II.     The same officer's non-*Mirandized* reinterrogation of Magaña Arévalo on December 3 was voluntary and noncustodial; the defense has failed to show that it was tainted by the December 1 *Miranda* violation

Magaña Arévalo acknowledges that the non-*Mirandized* police interrogation at his partner's home two days later, on December 3, was voluntary and noncustodial. He argues, instead, that his responses to police questioning on that day were tainted by the December 1 *Miranda* violation. Suppl. Br. of Pet'r at 22.[7]

Courts applying federal constitutional law have generally held that an earlier *Miranda* violation does not necessarily taint a separate, later police interrogation. *Oregon v. Elstad*, 470 U.S. 298, 309, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

The lower federal courts have fleshed out the prerequisites to application of this rule. They have held that an earlier *Miranda* violation does not taint a separate, later police interrogation as long as neither interrogation involves actual coercion

---

[7] This is a legal question concerning the interpretation of *Miranda* and federal constitutional law. We therefore review it de novo. *State v. Daniels*, 160 Wn.2d 256, 261, 156 P.3d 905 (2007).

and the later statements are voluntary and either spontaneous[8] or preceded by *Miranda* warnings.[9]

That's not what happened here. Magaña Arévalo's December 1 and December 3 statements were certainly voluntary and uncoerced. But they were not spontaneous, and they were not preceded by *Miranda* warnings.

The parties have not called our attention to any cases applying federal law to similar facts.

We have located a single, unpublished decision that does. In *United States v. Leon*, No. 8:19CR248, 2020 WL 2079261 (D. Neb. Apr. 30, 2020) (court order), the court suppressed defendant's statements (about his assault on his partner) made in

---

[8] All of the federal circuit courts to consider this issue (of which we are aware) have held that later spontaneous statements cut off the taint of the prior *Miranda* violation—as long as the initial *Miranda* violation did not involve coercion. *United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) ("The unwarned confession taken in violation of *Miranda* must be suppressed, but it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well."), 636 ("the admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda*, turns on whether the inculpatory statement was knowingly and voluntarily made"); *United States v. Abdulla*, 294 F.3d 830, 837 (7th Cir. 2002) (voluntary and spontaneous statement, made after an initial *Miranda* violation that did not involve coercion, admissible); *Medeiros v. Shimoda*, 889 F.2d 819, 826 (9th Cir. 1989) ("Although [defendant's] second [custodial, spontaneous, non-*Mirandized*] statement followed a previous voluntary but unwarned admission, the second statement was made voluntarily and, therefore, is admissible into evidence."); *accord United States v. Carr*, 63 F. Supp. 3d 226, 239 (E.D.N.Y. 2014) (later spontaneous and voluntary statement, made after initial *Miranda* violation, with no subsequent *Miranda* warnings, admissible).

[9] *Elstad*, 470 U.S. at 309 (suspect who was subjected to *Miranda* violation that did not involve actual coercion is not thereby disabled from waiving his rights and making a confession after *Miranda* warnings are given); *cf. Siebert*, 542 U.S. 600.

response to custodial interrogation without *Miranda* warnings. It then considered the admissibility of the defendant's noncustodial statements, which he made in response to questioning by police who arrived unannounced at his home one year later. After considering the same decisions cited in note 7, above, the district court analogized this situation—voluntary responses to police questioning in the suspect's front yard without custody or coercion—to the situation presented by the voluntary and spontaneous statements made in *Medeiros*, *Pettigrew*, and *Abdulla*.[10] That *Leon* court then concluded that the earlier, noncoercive *Miranda* violation did not taint the later, voluntary responses to noncustodial police interrogation.

The district court's reasoning is persuasive under federal law. It begins with the rationale and test used in *Elstad*. That test is, if there is no evidence of actual coercion or improper police tactics, the earlier interrogation does not affect "the admissibility of any subsequent statement"; instead, the admissibility of the subsequent statement at the later interrogation turns "solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 318. Given the fact that the subsequent non-*Mirandized* but voluntary police interrogation occurred a year later in Leon's own front yard, it was admissible under the holding and rationale of *Elstad*.

---

[10] *Medeiros*, 889 F.2d at 826; *Pettigrew*, 468 F.3d at 635; *Abdulla*, 294 F.3d at 837.

Magaña Arévalo does not argue that the police used actual coercion or other improper tactics on December 3, and he acknowledges that his December 3 statement was knowing and voluntary. Current federal law simply does not support his position, and he does not argue for an exception under our state constitution.

III. This court must reverse unless the State proves the error was harmless beyond a reasonable doubt; we consider both the taint of the unconstitutionally admitted evidence as well as the strength of the properly admitted evidence of guilt

*A. The proper test for constitutional harmless error*

Magaña Arévalo asks us to clarify the test for determining whether a constitutional error—like the admission of his non-*Mirandized* December 1 statement into evidence—is harmless. He explains that 40 years ago, in *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), we held that there were two separate and discrete tests for assessing harmless error—the "overwhelming untainted evidence" test and the "contribution" test—and that we discarded the "contribution" test and adopted the "overwhelming untainted evidence" test. He asks us to adopt the other test now, instead.

Magaña Arévalo accurately cites language we used in *Guloy*. In that case, the State charged Cannery Workers Union members Ben Guloy and Jim Ramil with aggravated first degree murder of two other Cannery Workers Union members in what the State described as a conspiracy to prevent reformers (like their two victims)

from interfering with plans by Guloy, Ramil, and other coconspirators, to manipulate the union to protect and expand their own illegal gambling operation. Both defendants were convicted as charged, but on appeal, this court ruled that the trial court committed constitutional error (in violation of the confrontation clause) by admitting out of court statements by absent coconspirator Tony Dictado against Guloy and Ramil.

We agreed that the trial court committed constitutional error. We then purported to clarify the test for deciding whether such a constitutional error in the admission of evidence was harmless beyond a reasonable doubt. We reviewed our cases and stated that we had previously used two separate tests for making this decision. We identified one as the "contribution test" and asserted that it looks "only" at whether the error itself contributed to the verdict. *Id.* at 426 (citing *State v. Evans*, 96 Wn.2d 1, 6, 633 P.2d 83 (1981) (Brachtenbach, C.J., concurring)). We identified the other as the "overwhelming untainted evidence test" and asserted that it "looks *only* at the untainted evidence" and examines whether such evidence "is so overwhelming that it necessarily leads to a finding of guilt." *Id.* (emphasis added).

Then we chose the "overwhelming untainted evidence test" over the "contribution test." We stated, "We believe the latter [overwhelming untainted evidence] test provides the better analysis. The 'overwhelming untainted evidence' test allows the appellate court to avoid reversal on merely technical or academic

grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." *Id.* Applying that test, we concluded, "Here, given the overwhelming amount and credibility of the properly admitted evidence, we find that the exclusion of two out-of-court statements by Dictado would not have resulted in a different verdict." *Id*. at 426.

That was certainly an understatement. The properly admitted evidence included eyewitness identifications of Guloy and Ramil hurrying away from the scene of the murder; evidence of motive for the murders of the two union reformer victims; and dying declarations by victim Gene Viernes, identifying Guloy as his killer. The unconstitutionally admitted evidence, in contrast, were two short out of court statements by a different coconspirator, Dictado, about his own intent to kill the victims. In other words, even if this court had explicitly weighed the prejudicial impact of the two improperly admitted statements against the strength of the properly admitted evidence, we would have come to the same conclusion: "[E]xclusion of two out-of-court statements by Dictado would not have resulted in a different verdict." *Id.*

Nevertheless, Magaña Arévalo is correct that our case law has used different language to describe the proper test for constitutional harmless error review. We have sometimes used language focusing on the overwhelming evidence test and we

have sometimes used language emphasizing the prejudicial nature of the unconstitutional error.

We therefore take this opportunity to clarify that the correct approach considers both. In conducting constitutional harmless error review, we hold the reviewing court must ask whether the State has proved the error harmless beyond a reasonable doubt, considering *both* the strength of the properly admitted evidence of guilt as well as the prejudicial impact of the erroneously admitted evidence on even the properly admitted evidence.

This was basically the test that the United States Supreme Court adopted in its seminal constitutional harmless error decision. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (considering the prejudicial impact of the prosecutorial comments on defendant's right to remain silent along with the lack of strength of the State's basically "circumstantial evidence" case and holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). It is still the constitutional harmless error test that the United States Supreme Court uses today. *See Neder v. United States*, 527 U.S. 1, 15-20, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (erroneous jury instruction omitting element of offense is an error subject to constitutional harmless error analysis; court considered both the strength of the

properly admitted evidence against Neder as well as the prejudicial impact of the erroneous instruction and concluded that such error was harmless).

And critically, it is the test that the bulk of this court's constitutional harmless error cases have applied in practice—regardless of the linguistic description of the test that we used.

For example, in *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996), the State charged Patrick Easter with vehicular assault after he collided with a taxicab carrying six students. *Id.* at 231. At trial, Officer Fitzgerald testified that at the scene, Easter ignored him and his questions and that Easter "'was being smart drunk.'" *Id.* at 233. During closing argument, the prosecutor also reiterated Fitzgerald's testimony about Easter's prearrest refusal to answer his questions and the fact that it meant that Easter was being a "smart drunk." We reversed and remanded. *Id.* at 243. We ruled that admission of evidence and argument about Easter's prearrest silence violated his right to remain silent. *Id.* at 241.

We then considered whether this constitutional error was harmless. *Id.* at 242. We described the constitutional harmless error test as one that requires us to determine whether the State has proved, beyond a reasonable doubt, that "any reasonable jury would reach the same result absent the error." *Id*. We characterized this as requiring the state to prove that "the untainted evidence is so overwhelming it necessarily leads to a finding of guilt." *Id.*

Nevertheless, as a practical matter, we evaluated both the untainted evidence of guilt as well as the prejudicial impact of the unconstitutionally admitted statements. The untainted evidence of guilt included conflicting eyewitness testimony and expert opinions about which driver had the right of way, so it was not overwhelming. *Id.* The unconstitutionally admitted evidence, in contrast, was strong and extremely prejudicial: "The State's emphasis on Easter's silence to argue his guilt may well have swayed the jury." *Id.* In sum, despite the fact that we said that we would look at only the untainted evidence, we actually looked at both the tainted and the untainted evidence, considered the impact of the tainted evidence, concluded that the impact of that tainted evidence was high, and reversed.

We did basically the same thing in *State v. Jones*, 168 Wn.2d 713, 724, 230 P.3d 576 (2010). In that case, the State charged Christopher Jones with second degree rape after Jones's niece, K.D., claimed that he put his hands around her neck and forcibly raped her. *Id.* at 717. Jones sought to testify that he and K.D. engaged in consensual sex at a drug-induced sex party. *Id.* But the trial court ruled that the rape shield statute barred admission of such evidence, no matter how important it was to his defense. *Id.* at 717-18.

We reversed. *Id.* at 725. We ruled that exclusion of evidence so important to the defense theory of consent violated Jones's Sixth Amendment right to present a defense. *Id.* at 720-21; U.S. CONST. amend. VI. We then considered whether the trial

court's error in excluding Jones's testimony was harmless. Again, we considered both the properly admitted evidence as well as the prejudicial impact of the constitutional error.

> Admittedly, Jones's version of the events is not airtight. He did not call any of the other members of the alleged sex party as witnesses, K.D.'s testimony directly contradicted Jones's account, and only Jones's semen was found on K.D. *Nevertheless, a reasonable jury that heard of a consensual sex party may have been inclined to see the sexual encounter in a different light*. The jury would have heard a completely different account of the events of that night, so it is possible that a reasonable jury may have reached a different result.

*Id.* at 724 (emphasis added). In sum, we actually looked at both the constitutional error as well as the untainted evidence, considered the probable impact of that constitutional error, concluded that the impact of that error was high, and reversed.

Our decision in *State v. A.M.*, 194 Wn.2d 33, 41-44, 448 P.3d 35 (2019), follows the same pattern. In that case, A.M., a juvenile, entered a Goodwill store with two adults, put costumes into a backpack, and tried to leave without paying. *Id.* at 36. When police officers arrived, they arrested A.M. for theft and found baggies of methamphetamine "in one of the smaller outer pockets" of the backpack. *Id.* at 36. Officers booked A.M. in the juvenile detention center, and A.M. signed an inventory form listing her personal belongings, which included the backpack. *Id.* at 37. A.M. signed the same form again when she was released. *Id.*

At trial, A.M. claimed that it was not her backpack and she didn't know what was in that pocket. The trial court convicted her of third degree theft and possession of a controlled substance. *Id.* We reversed. *Id.* at 44. We first determined that admission of the inventory form violated A.M.'s privilege against self-incrimination *Id.* at 41. We then addressed whether admission of the inventory form was harmless. We described the constitutional harmless error test in terms similar to the contribution test: "A constitutional error is harmless if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" *Id.* (quoting *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting *Neder*, 527 U.S. at 15)). But we then considered both the untainted evidence and the impact of the unconstitutionally admitted evidence. We concluded that even the properly admitted evidence "showed only that A.M. put the costumes into the main pouch of the backpack." *Id.* at 43. We noted that the unconstitutionally admitted signed inventory form was the only evidence that reasonably contradicted A.M.'s assertion that her possession of the drugs was unwitting. *Id.* at 41-43. In sum, we considered both the untainted evidence as well as the impact of the unconstitutionally admitted evidence, considered the probable impact of that unconstitutionally admitted evidence, concluded that the impact of that error was high, and reversed.

We did the same thing again in *State v. Burke*, 196 Wn.2d 712, 739, 478 P.3d 1096 (2021). In that case, the State charged Ronald Burke with second degree rape by forcible compulsion. *Id.* at 718. Before trial, the State sought to admit the victim's statements that she made to a nurse during her sexual assault examination under the hearsay exception for statements made for purposes of medical diagnosis or treatment, ER 803(a)(4). *Id.* The trial court agreed with the State and admitted the out of court statements at trial. *Id.* at 723. The jury convicted, the Court of Appeals reversed, and we granted review. *Id.* at 725.

We reversed the appellate court's decision and affirmed the conviction. *Id.* at 744. We ruled that most of the nurse's testimony complied with the confrontation clause. *Id.* at 737. But we ruled that the nurse's testimony about the victim's statement describing her assailant violated that constitutional provision. *Id.* at 738.

We then considered whether admission of the statement was harmless. *Id.* at 739. This time, we described our constitutional harmless error test in terms reminiscent of the overwhelming untainted evidence test. *Id.* ("error is harmless '[i]f the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt.'" (quoting *State v. Koslowski*, 166 Wn.2d 409, 431, 209 P.3d 479 (2009))). Nevertheless, we considered the prejudicial impact of the victim's improperly admitted statement to the sexual assault nurse describing Burke's "height, skin color, and clothing," which the nurse read aloud to the jury. *Id.* at 738.

41

We compared it to the strength of the properly admitted evidence of identity, which included DNA evidence identifying Burke as the likely donor of the semen. *Id.* at 739. Critically, we concluded that "[the victim]'s description of the assailant was relevant only to identifying Burke as the person who raped her, but it was cumulative . . . ." *Id.* In other words, once again we considered both the untainted evidence as well as the unconstitutionally admitted evidence, considered the impact of that unconstitutionally admitted evidence, concluded that the impact of the error was low, and affirmed the conviction.

Most of our other cases have done exactly the same thing, regardless of the language they used to describe the nuances of the constitutional harmless error test. We have considered the strength of the properly admitted evidence of guilt as well as the impact of the unconstitutionally admitted evidence or other constitutional error. *E.g.*, *State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 364, 440 P.3d 994 (2019) (defendant charged with rape and related crimes offered evidence to impeach victim's credibility, trial court's exclusion of this evidence violated constitutional right to present a defense, on review for constitutional harmless error we "'assum[ed] that the damaging potential of the cross-examination [was] fully realized'" and considered that taint as well as all the other properly admitted evidence, and affirmed the conviction (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986))); *State v. Franklin*, 180 Wn.2d

42

371, 383, 352 P.3d 159 (2014) (exclusion of defendant's proffered other-suspect evidence violated constitutional right to present a defense; we examined both the properly admitted evidence as well as the unconstitutionally excluded evidence that another person "had the motive, ability, and opportunity to commit the charged crime, and that she had personally threatened [victim] regarding her relationship with Franklin" and concluded that the taint of the exclusion undermined the verdict); *State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012) (evaluating prejudicial effect of confrontation clause error in three consolidated cases concerning admission of driving records by examining both the properly admitted evidence as well as the impact of the unconstitutionally admitted driving records); *see also Brown*, 147 Wn.2d at 338 (erroneous accomplice liability jury instruction evaluated under constitutional harmless error standard; court considers both the strength of the properly admitted evidence against three defendants as well as the prejudicial impact of the erroneous jury instruction); *cf. State v. Anderson*, 171 Wn.2d 764, 254 P.3d 815 (2011) (considering only the properly admitted evidence to assess harmless error); *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 327 P.3d 660 (2014) (analyzing only the strength of the properly admitted evidence).

Basically, our court has sometimes used different language to describe the proper test for deciding whether a constitutional error like the one in this case is harmless. But in the bulk of our cases, we have considered (1) the corrosive impact

of the constitutional error (here, the improperly admitted evidence), including its impact on how the fact finder might consider even the properly admitted evidence, as well as (2) the strength of the properly admitted evidence of guilt. Considering the impact of both types of evidence, we then ask whether the State has carried its burden of proving that the constitutional error is harmless beyond a reasonable doubt.

We now reaffirm that that is the correct test for evaluating constitutional harmless error.

> B. *Applying the proper test for constitutional harmless error, the State has carried its burden of proving beyond a reasonable doubt that the improper admission of Magaña Arévalo's non-*Mirandized *statements was harmless*

Magaña Arévalo's December 1 statement should have been suppressed. As discussed above, in that statement he made contradictory assertions, but he did acknowledge that he had a motive to retaliate against Hobbs, that he owned a truck similar to the one viewed at the scene of the murder, and that he had a run in with Hobbs at a Subway shortly before the shooting.

But the properly admitted evidence covered much of the same territory. First, Hobbs's girlfriend, Amanda Gipson, testified at trial that Hobbs called her on the day he ran into Magaña Arévalo at Subway. 2 RP (May 3, 2022) at 689-90. Hobbs

had told Gipson that he and Magaña Arévalo planned to "meet up" because they "wanted to get the fight over and done with." *Id.* at 690-91.

Second, Phillip Eagan-McCoy, another witness, testified that he and Hobbs were together the day Hobbs was murdered. 4 RP (May 23, 2022) at 1843. He said that Hobbs told him that Hobbs intended to meet with both Magaña Arévalo and Magaña Arévalo's brother, Jose, to "[t]ry to settle a beef . . . ." *Id.* at 1844-45. Eagan-McCoy also testified that the "beef" concerned "an ongoing problem with [the brothers]" and that "they kept coming after [Hobbs]." *Id.* at 1845. Eagan-McCoy further testified that Hobbs said he had planned a meeting with Magaña Arévalo at Elijah Chambers's apartment, where he was later shot. *Id.* at 1846.

Third, a series of Facebook messages entered into evidence also revealed that Magaña Arévalo had a "beef" with Hobbs and that Magaña Arévalo met with Hobbs on the day of the shooting. 4 RP (May 11, 2022) at 1589-90. The messages were between Magaña Arévalo and Megan Bradshaw. *Id.* Bradshaw wrote "'Cristian, I know you met up with Baby J [Hobbs].'"[11] *Id.* at 1589. Bradshaw asked Magaña Arévalo if he knew what happened to Hobbs. *Id.* Magaña Arévalo responded that he did not know and that he was with his family "'all day.'" *Id.* at 1590. But Magaña Arévalo also admitted "those foo[l]s saw me for a sec[ond]." *Id.* Bradshaw then told

---

[11] On cross-examination, Magaña Arévalo testified that he was aware that Hobbs's nickname was "Baby J." 5 RP (May 24, 2022) at 2011.

Magaña Arévalo to talk with Jose. *Id.* Magaña Arévalo responded in the messages that while he did not see Jose that day, he told Jose that he "'saw Baby J,'" and "'even squashed the beef with him.'" *Id.*

Magaña Arévalo's admissible statement on December 3 covered similar grounds. Magaña Arévalo acknowledged that he knew Hobbs had shot at his uncle's home while his partner and child were there. CP at 121; 3 RP (May 10, 2022) at 1469. Magaña Arévalo asserted that Hobbs laughed about the shooting, that Hobbs admitted to shooting at Magaña Arévalo's uncle's home, and that Hobbs bragged about being the principal shooter. CP at 122; 3 RP (May 10, 2022) at 1469; 5 RP (May 24, 2022) at 2122.

Considering the corrosive impact of the erroneously admitted statement, along with the strength of the properly admitted evidence of guilt, the State has proved that the *Miranda* violation was harmless beyond a reasonable doubt.

CONCLUSION

We hold that Magaña Arévalo was in custody during the December 1 interrogations because, considering the totality of the circumstances, law enforcement curtailed his freedom of movement to a degree associated with formal arrest. The trial court therefore erred in admitting that December 1 statement as substantive evidence at trial, and the Court of Appeals correctly reversed the trial court on that point.

We hold that the *Miranda* violation that occurred during the custodial interrogation on December 1 did not taint the later, voluntary, noncustodial interrogation on December 3. Thus, the trial court correctly denied the motion to suppress the December 3 statement and the appellate court correctly affirmed that decision.

Finally, we reaffirm that the State has the burden of proving that a constitutional error is harmless beyond a reasonable doubt. When applying that test, reviewing courts must consider both the prejudicial impact of the erroneously admitted evidence on even the properly admitted evidence, as well as the strength of the properly admitted evidence of guilt. Applying that test, the State has carried its burden in this case.

We therefore affirm the Court of Appeals.

_____
Gordon McCloud, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____

_____

_____

_____
Mungia, J.

No. 103586-1

YU, J.[*] (concurring) — The majority affirms Cristian Magaña

Arévalo's[1] conviction, applying the Fifth Amendment to the United States

Constitution.  I do not seek to challenge the majority's analysis of the federal

constitution and harmless error.  I further agree that Magaña Arévalo does not

adequately raise an independent state law claim pursuant to article I, section 9 of

the Washington Constitution.  *See* majority at 3, 33.  Nevertheless, I write

separately to highlight the urgent need to give independent meaning to our state

constitution.  We cannot continue relying on the limited protections of the federal

constitution as they are steadily eroded by those who are openly hostile to the

rights of vulnerable individuals.  The people of Washington deserve better from the

courts and attorneys who serve them.  I therefore respectfully concur.

---

[*] Justice Mary Yu is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] When referring to the petitioner, we follow the way petitioner spells and formats his name in his most recent briefs in this court.

ANALYSIS

I cannot dispute the majority's analysis of the Fifth Amendment issues

presented. The federal constitution *should* provide complete relief to Magaña

Arévalo, given the flagrantly unlawful interrogation he experienced on December

1, and law enforcement's subsequent exploitation of the illegality on December 3.

As this court has previously recognized, "[t]he passage of time and the opportunity

for reflection do not render [a statement] voluntary if the reflection was prompted

by an improper interrogation." *State v. Sargent*, 111 Wn.2d 641, 654, 762 P.2d

1127 (1988) (plurality opinion). Moreover, as discussed by the majority, we

"cannot ignore the suspect's race or ethnicity" in evaluating the totality of the

circumstances, and Magaña Arévalo's identity as a young Latino is clearly relevant

to the analysis in this case. Majority at 2, 23-27.

Nevertheless, the federal constitution is becoming increasingly ineffective in

protecting the rights of individuals against blatantly racist governmental overreach.

*E.g.*, *Noem v. Vasquez Perdomo*, ___ U.S. ___, ___ S. Ct. ___, 222 L. Ed. 2d 1213,

1215-16 (2025) (Kavanaugh, J., concurring in grant of application for stay). As a

result, I respectfully concur in the majority's analysis of Magaña Arévalo's federal

constitutional claims and the harmless error test. However, I cannot "stand idly by

while our constitutional freedoms are lost." *Id.* at 1219 (Sotomayor, J., dissenting).

Therefore, I write separately to express my view that if the federal constitution

2

does not protect individuals in Magaña Arévalo's position, our state constitution must do so.

Article I, section 9 of the Washington Constitution provides that "[n]o person shall be compelled in any criminal case to give evidence against [themselves]." In previous cases, this court has held that article I, section 9 provides "the same level of protection" against self-incrimination as the Fifth Amendment. *In re Dependency of A.M.-S.*, 196 Wn.2d 439, 445, 474 P.3d 560 (2020) (citing *State v. Mendes*, 180 Wn.2d 188, 194, 322 P.3d 791 (2014)).

Yet, "history is not a static factor" in our state constitutional jurisprudence; we must also "consider the current implications of recognizing (or failing to recognize)" heightened state constitutional protections. *State v. Sum*, 199 Wn.2d 627, 640-41, 511 P.3d 92 (2022). This is particularly true where the minimum protections of the federal constitution have "changed or disappeared altogether." *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014). Indeed, "this court *must* have the flexibility to consider emerging United States Supreme Court case law when considering earlier decisions on federal issues . . . even when the newer cases have not directly overruled or superseded prior cases." *Id.* (emphasis added).

It is clear that federal constitutional protections are being steadily eroded, particularly as applied to "anyone who looks Latino, speaks Spanish, and appears

3

to work a low wage job." *Vasquez Perdomo*, 222 L. Ed. 2d at 1219 (Sotomayor, J., dissenting). We cannot allow our state constitution to follow the same path. Thus, as Magaña Arévalo correctly observes, this court has the authority and the responsibility "to 'develop a body of independent jurisprudence,' on article I, section 9 of our state constitution." Suppl. Br. of Pet'r at 17 (quoting *City of Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988)). However, we cannot do so in a principled manner unless the state constitutional issues are sufficiently briefed.

In this case, Magaña Arévalo and amici address the need for independent state law protections as applied to "the totality of the circumstances custody analysis." Br. of Amici Curiae Ctr. for C.R. & Critical Just., Am. C.L. Union of Wash., & King County Dep't of Pub. Def. at 10. We need not reach these arguments, given the majority's analysis and conclusion that Magaña Arévalo was in custody when he was interrogated on December 1. Nevertheless, amici's proposed framework for an independent article I, section 9 "custody analysis" may prove to be an invaluable resource for future litigants and courts.

In addition, the facts of this case strongly indicate the need for an independent exclusionary rule to determine when incriminating statements must be suppressed due to the "taint" of a previous article I, section 9 violation. *See* majority at 30-33. It is undisputed that at 6 a.m. on December 1, 2018, 21-year-old

Magaña Arévalo was ordered out of his home by megaphone, restrained with zip ties, driven to a remote location, isolated from his family, and subjected to a recorded custodial interrogation without any advisement of his article I, section 9 rights. Clerk's Papers at 296-99. Two days later, the same law enforcement officer went to Magaña Arévalo's home to ask "follow-up questions" about the illegally obtained statements, again without any advisement of his article I, section 9 rights. *Id.* at 300-01. As the majority explains, the December 3 statement "repeated the bulk of [the] December 1 statement." Majority at 4.

These facts clearly show that law enforcement obtained Magaña Arévalo's December 3 statement by exploiting the prior violation of his constitutional rights on December 1. On both days, officers went to Magaña Arévalo's home to interrogate him about suspected criminal activity. The same officer participated in both interviews, which "covered similar grounds." *Id.* at 46. Because Magaña Arévalo was never informed of his rights, he had no way of knowing the December 1 statements were inadmissible, so he had no reason to avoid repeating the same information on December 3. He was only 21 years old at the time and, as the majority recognizes, he was growing up as a Latino in a society where "Latinos were killed by police at a rate 1.3 times greater than non-Hispanic white people, and police use-of-force rates, stop rates, and incarceration rates of Latinos are all higher than the rates of their non-Latino counterparts." *Id.* at 25. And what excuse

is there for this officer's disregard for advising Magaña Arévalo of his right to remain silent and to ask for counsel?

Given these circumstances, I cannot believe that Magaña Arévalo's December 3 statements were truly "voluntary" in any meaningful sense. He was repeatedly interrogated under intimidating and coercive circumstances with no advisements of his rights, and he lacked sufficient information to evaluate the risks of asserting, or waiving, his privilege against self-incrimination. These facts may not affect the admissibility of the December 3 statement for purposes of the Fifth Amendment. However, for purposes of article I, section 9, Magaña Arévalo was almost certainly "compelled . . . to give evidence against himself" on December 3 due to the taint of the illegal interrogations on December 1. Our state constitution should not tolerate such violations Nevertheless, I must concur in the result reached by the majority, as the parties and amici have not argued for heightened state law protections on this issue.

## CONCLUSION

As federal jurisprudence becomes "unconscionably irreconcilable with our Nation's constitutional guarantees," this court plays a crucial "role as a democratic, accountable institution elected to safeguard the numerous interrelated individual rights under our State Constitution." *Vasquez Perdomo*, 222 L. Ed. 2d at 1230 (Sotomayor, J., dissenting); Br. of Amici Curiae Ctr. for C.R. & Critical Just., Am.

C.L. Union of Wash., & King County Dep't of Pub. Def. at 36.  To fulfill this role,

we must examine the current implications of continuing to interpret state

constitutional provisions in lockstep with federal law and, in appropriate cases with

sufficient briefing, we must be open to recognizing heightened state law

protections where we have not previously done so.

With these observations, I respectfully concur.

_____
Yu, J.P.T.

_____
Whitener, J.

_____
Mungia, J.

No. 103586-1

GONZÁLEZ, J. (concurring in part and dissenting in part) — I agree with much in the majority opinion. On December 1, 2018, Cristian Magaña Arévalo[1] was ordered from his home by a police special weapons and tactics team (SWAT), was separated from his family, had his wrists zip-tied behind his back, and was taken in a police car to a third location and questioned by police. Under those facts, I find it extraordinary that any jurist would have concluded he was not in custody or that he was not unconstitutionally compelled to testify. Accordingly, I agree with the majority that Magaña Arévalo's December 1 statements should have been suppressed.

I also agree that the error was constitutional. And I agree that the proper test for constitutional harmless error in these circumstances considers both the untainted evidence and the corrosive impact of the improperly admitted evidence,

---

[1] When referring to the petitioner, we follow the way petitioner spells and formats his name in his most recent briefs in the Supreme Court.

as well as anything else in the facts of the case that bears on whether the State has established, beyond a reasonable doubt, that the error did not contribute to the verdict.

I part company with the majority, however, in its conclusion that the taint of the December 1 interrogation did not so infect the December 3 interrogation that those statements should not also be suppressed.

My colleagues are almost certainly correct that under federal constitutional law as currently understood by our federal courts, the December 3 interview with Magaña Arévalo was voluntary and his non-*Mirandized* answers are admissible. They are also correct that this issue received scant attention in the briefing. But "this court has inherent authority to consider issues not raised by the parties if necessary to reach a proper decision." *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988) (citing *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972)).

I can read our own State constitution, and it is plain. "No person shall be compelled in any criminal case to give evidence against himself." WASH. CONST. art. I, § 9. On December 1, 2018, Magaña Arévalo was compelled to give evidence against himself when he was ordered out of his house by a SWAT team, restrained with zip ties, taken from his home, isolated from his family, and interrogated by officers. When one of those officers went to Magaña Arévalo's

2

home two days later to ask "follow-up questions," Clerk's Papers at 300-01, that second interview was in every meaningful way simply a continuation of the first. On these facts, nothing dissipated the compulsion of that original interview by the time the police arrived at his house on December 3, 2018. Magaña Arévalo should have been advised of his rights. As he was not advised of his rights, his statements should have been suppressed under article I, section 9 of our state constitution.

While I generally agree with the majority's formulation of the constitutional harmless error test, I cannot agree that the State has met its burden of showing that the error was harmless beyond a reasonable doubt. In the interviews, Magaña Arévalo revealed a possible motive for killing Hobbs: that Hobbs had shot up his uncle's house, endangering his partner and child. The State anchored its case on this supposed motive. 2 Rec. of Proc. (RP) (May 3, 2022) at 666; 5 RP (May 24, 2022) at 2122-23. While the State offered some corroboration for some conflict between Hobbs and Magaña Arévalo, none was as specific or vivid as the motive suggested by Magaña Arévalo's own words.

Furthermore, had Magaña Arévalo's December interviews not been admitted, he almost certainly would not have felt compelled to testify. Under our constitutions, the State bears the burden of proving its own case without the accused's help. Admitting those interviews undermined the State's burden in

multiple ways.  The State has not persuaded me it has met its burden of establishing the error was harmless beyond a reasonable doubt.

With these observations, I respectfully concur in part and dissent in part.

González, J.

Montoya-Lewis, J.